**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

_____

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                  Case No. 18-cr-02426-WJ-1

DANIEL CAPEHART,

     Defendant.

**MEMORANDUM OPINION AND ORDER ON THE SENTENCING OF DEFENDANT**

In 2018, New Mexico State Police officer Daniel Capehart provided drugs from the police department to a teenage girl and a woman with a methamphetamine addiction. He exchanged texts of a flirtatious and sexual nature with these victims that made both of them uncomfortable. He gave the teenage girl advice about how to avoid police detection when picking up the marijuana he left for her. Overall, he took advantage of his institutional power as an officer and behaved as if the law was only something other people had to follow.

Defendant exercised his constitutional right to proceed to trial by jury and was found guilty on all three counts: distribution of marijuana, distribution of marijuana within one thousand feet of a school and playground, and distribution of five grams and more of methamphetamine within one thousand feet of a school and playground. Doc. 144. With a criminal history score of zero and an offense level of 28, the undisputed sentencing range calculated under the United States Sentencing Guidelines was 78–97 months. Doc. 159 ¶¶ 37, 41, 70. The third count, pertaining to methamphetamine, has a mandatory minimum of 60 months, which is the sentence Defendant sought a downward variance to attain. *Id.* at 2; Doc. 170 at 1. The United States argued for a high-end Guidelines sentence of 97 months. Doc. 173 at 1. Having reviewed the parties' submissions

and the applicable law, the Court determines that a sentence of 84 months is sufficient but not greater than necessary to achieve the goals of sentencing.

## BACKGROUND

On June 15, 2018, four years into his tenure as a New Mexico State Police officer, Defendant Daniel Capehart pulled over a vehicle with two teenage girls: a seventeen-year-old driver and a sixteen-year-old passenger. Doc. 159 ¶ 6. He asked the passenger, Jane Doe, to exit the vehicle. *Id.* She provided him with her cell phone number, address, and other personal identifiers, and he gave her a business card with his name and personal cell phone number. *Id.* He issued three citations to the driver. *Id.*

About an hour after the 9:30 p.m. traffic stop, Defendant texted Jane Doe, identifying himself as the officer who had pulled her acquaintance over. *Id.* ¶¶ 6–7. He continued to text Doe flirtatious messages even though she explicitly told him her age; Doe continued to message him because he had stated that he would drop the charges against the driver.[1] *Id.* ¶ 7. Doe informed her father of what had happened, and they reported the events to the San Juan County Sheriff's Office ("SJCSO") a few days later on Tuesday, June 19. *Id.* ¶¶ 6–8. They gave the detective permission to use Doe's cell phone to continue to text Defendant. *Id.* ¶ 8.

Defendant continued his correspondence with the detective he believed to be Jane Doe. *Id.* He corresponded with "her" about marijuana, sent pictures of containers filled with a leafy green substance and a glass pipe and asked her if she knew what they were, and ultimately coordinated a location for a drop of what he referred to as "medical grade" marijuana. *Id.* He provided instructions about how to hide the marijuana and said to delete the text messages comprising their

---

[1] In these texts, Defendant referred to Doe as "the hottest woman I've ever seen in my life," to which Doe responded that she was sixteen and Defendant replied that "age is just a number." He also told her she had a "gorgeous face" and referred to her as "model status." Gov. Ex. 1. at 2–3.

conversation. *Id.* At 11:48 p.m. on June 20, he texted "Doe" a picture of a baggie filled with a leafy green substance, suggested that she hide it in her bra, and told her that she owed him a "selfie" as payment. *Id.* ¶ 9. Around 12:52 a.m., a detective and an SJCSO lieutenant saw Defendant leave his car, place something in the drop location, and leave; the detective examined the location afterward and found what appeared to be the same leafy green substance that Defendant had photographed and sent to Doe. *Id.* Later tests came back positive for 2.01 grams of marijuana. *Id.*

Defendant texted "Doe" for the next few days and said that he had a gift for her, which he confirmed was the same as the previous item. *Id.* ¶ 10. They set up a second drop for Saturday, June 23 at a car wash, and Defendant again provided instruction about how to transport the marijuana without law enforcement detection. *Id.* A detective and an SJCSO lieutenant surveilling the car wash observed Defendant driving a marked police car in the opposite direction, and when they searched the specific drop location Defendant had identified in his texts, they found what testing would later reveal to be 12.8 grams of marijuana. *Id.* ¶ 11.[2]

Shortly thereafter, on June 28, 2018, a confidential source spoke to an FBI Special Agent and informed him that she had been in contact with Defendant for approximately nine months, ever since Defendant pulled her over for a traffic stop and arrested her for driving-related offenses. *Id.* ¶ 12. Defendant began texting her messages that made her uncomfortable due to their sexual

---

[2] Throughout his correspondence with the detective he believed to be Jane Doe, Defendant's texts escalated in their sexual character. He referred to her as "smoking hot," told her she had a "gorgeous body," and responded to a message she sent about going to the lake by saying that he would "love to put the tanning stuff on for you." Gov. Ex. 1 at 9, 17, 23. He told her she had "the body of a woman" and commented on her appearance by saying "Booty all perfect and shit." *Id.* at 24, 29. He also texted her, "Send me a sexy pic and I'll send one of what I got" and when she declined, he messaged, "It just sucks not seeing you with an amazing booty that you have." *Id.* at 35–36. These sexually suggestive and inappropriate text messages—sent by a 33-year-old married male New Mexico State Police officer to a 16-year-old female juvenile who had been a passenger in a vehicle Defendant stopped—certainly add credence to the theory advanced by the United States that Defendant's ultimate goal was to furnish Doe with marijuana in exchange for sexual favors.

tone.[3] *Id.* The confidential source gave the special agent permission to use her phone to text Defendant, and the agent and Defendant exchanged several messages concerning sex and illegal drugs. *Id.* They set up a false drug bust: the plan was for the confidential source to tell Defendant about a third-party methamphetamine seller so Defendant could arrest the third party, and then Defendant would give the confidential source a cut of the drugs. *Id.* (In reality, the special agent was the one who created the plan, and the third party was an undercover officer. *Id.*) Defendant apprehended the seller, seized the methamphetamine on the seller's person, and texted the confidential source that he would provide her with a "good size rock" later, once he was away from the police cameras recording his unit. *Id.* ¶¶ 13–14.

At 1:51 a.m. on June 29, 2018, after booking the undercover officer *qua* meth seller into jail, Defendant drove his police car to a public park, a location he selected, and dropped the methamphetamine off in the bathroom area. *Id.* ¶ 15. He texted the confidential source the exact location and instructed her to wait ten minutes before searching for it. *Id.* The FBI task force officer and special agent located the substance in the location Defendant had indicated; testing revealed it to be 5.6611 grams of methamphetamine at 99% purity. *Id.* ¶ 16. Defendant was arrested later that day. *Id.* ¶ 17.

During his post-arrest interview, Defendant claimed his intent was to establish connections with possible future confidential sources for police investigation. *Id.* ¶ 18. He said that he had thought about pursuing sexual relationships with these women, but that he would not cheat on his wife. *Id.* ¶ 19. A subsequent search of his phone revealed a password-protected app containing photos of women who were not Defendant's wife in different states of undress. *Id.* ¶ 21. Some of

---

[3] Among other sexually explicit messages, Defendant texted her, "So what say we just hook up, make the craziest love ever and kick it?", said "I've never been in those sexy thighs ;)", asked her to "let me hit that fine booty," and told her "We both have addictions.  I need that ass and you your meds." Gov. Ex. 12 at 2, 5, 10, 11.

these photos could be connected to text messages on Defendant's phone suggesting that he was in sexual relationships with these women. *Id.* ¶ 23.

## DISCUSSION

Every federal sentencing should begin with a Guidelines calculation as an "initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Although they were once mandatory, the Guidelines have been advisory for well over a decade. *United States v. Booker*, 543 U.S. 220, 245 (2005). Still, this initial calculation matters—it is the "benchmark for the entire sentencing process[.]" *United States v. Brown*, 974 F.3d 1137, 1144 (10th Cir. 2020) (citation omitted). A judge may depart from this range based on the factors outlined in Part 5K of the Guidelines—substantial assistance to authorities, extreme conduct, aberrant behavior, and so on—or may vary upward or downward based on the sentencing factors in 18 U.S.C. § 3553(a). The overarching aim is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). The purposes of sentencing are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To accomplish these purposes, the Court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the dictates of the sentencing guidelines and Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims of the offense. *Id.* § 3553(a).

Considering the serious nature of Defendant's criminal conduct perpetrated while he was in uniform as a patrol officer with the New Mexico State Police, the United States' request for a

sentence at the high end of the applicable sentencing guideline range is not at all unreasonable. However, Defendant's history and characteristics provide him some support. He served honorably in combat as an infantryman in the United States Marine Corps for two tours of duty in Iraq and received multiple awards for his service. Doc. 159 ¶ 67. He was diagnosed with PTSD in November 2018—after his time as a police officer ended. *See id.* at 13 ¶ 55. He also earned a master's degree in communication from Eastern New Mexico University in May 2021 while under pretrial conditions of release. *Id.* ¶ 57. He does not have any criminal history, and his life as a law-abiding citizen before he was charged in the instant case earns him some lenience. *See id.* ¶¶ 39–41. Therefore, the Court finds that a high-end Guidelines sentence of 97 months would be greater than necessary to carry out the goals of sentencing.

However, Defendant's crimes were highly serious, and their effects ripple out to impact the entire community. *See Doe v. Marsalis*, 202 F.R.D. 233, 238 (N.D. Ill. 2001). At the center are, of course, the teenage girl and the confidential source to whom Defendant sent sexual texts and provided drugs. In the case of the sixteen-year-old girl, he *taught* her criminal behavior, sending instructions on how to avoid law enforcement detection; it is fortunate that by this point he was communicating with a detective rather than the girl herself. And in addition to these explicit instructions, he taught her another, more chilling lesson: that an officer of the law who pulls her over on the side of the road may have ill intentions. He taught her that an officer may use the power society has granted him to seek his own sexual gratification by sending her flirtatious messages or requesting photographs from her. In short, he taught her that not all officers can be trusted, and she will never know in advance which ones are safe.

The harm his crime did to the confidential source also cannot be understated. The confidential source was a drug addict, and Defendant took advantage of her vulnerability by

offering her fuel for that addiction. As a confidential source who has previously grappled with the legal system due to her methamphetamine addiction, the Court is confident that she has seen and experienced the worst aspects of society. While it was her decision to engage in illegal activity that rendered her especially vulnerable to exploitation, Defendant as a patrol officer with the New Mexico State Police is the very type of person who was supposed to "protect and serve" people, like the confidential source, who are vulnerable in society. Certainly, his conduct toward her is not the type that encourages a person to follow the law.

Further concrete harm occurred because the drugs Defendant provided to the teenage girl and the confidential source came from the law enforcement evidence locker. His decision to take those drugs and use them for unauthorized purposes could interfere with other investigations and prosecutions. By treating the evidence locker as his own personal stash, Defendant potentially compromised other law enforcement investigations.

Beyond the concrete damage Defendant's actions have done, the reputational damage to law enforcement generally and specifically to the New Mexico State Police is difficult to measure. The officers who do their jobs admirably suffer from the shadow Defendant cast on their departments and on law enforcement in general. Every abuse of power chips away at the relationship between the public and the police. The community experiences doubt about whether the individuals they elevate to power truly keep them safe; they worry about their own sixteen-year-old daughters, their sisters who struggle with addiction, and their own inability to discern whether an officer they encounter will follow the law. Broken trust takes time to heal, and the burden of rebuilding that trust falls on the rest of the law enforcement community—those who have done nothing wrong themselves but are left to mend their agencies' reputations in the eyes of a justifiably upset and skeptical public.

The nature of Defendant's criminal conduct, in short, is that it has harmed the two victims in this case and the community in ways that will affect them for some time to come. A downward variance from the Sentencing Guidelines in this case is not warranted. Accordingly, the Court finds that a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing is a within sentencing guideline term of imprisonment of 84 months, divided among the three counts as follows:

> Count 1: 60 months (concurrent)
> Count 2: 84 months (concurrent)
> Count 3: 84 months (concurrent).

To aid the community in recovering from the damage Defendant's conduct has caused, the Court also orders community restitution in the amount of $5000.00, divided as follows:

> $3250 to the New Mexico Crime Victim Reparation Commission Crime Victims Fund
> $1750 to the Behavioral Health Services Division of the New Mexico Human Services Department.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE